IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 18-cr-00300-RM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2. ROLAND VAUGHN,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Anna Edgar, Assistant United States Attorney for the District of Colorado, and the defendant, Roland Vaughn, personally and by counsel, John Schlie, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

## I. AGREEMENT

This agreement is submitted to the Court for its consideration pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure.

***Defendant's Obligations***

<u>Guilty Plea</u>

    1.    The defendant agrees to plead guilty to Count 27 of the Superseding Indictment, charging a violation of Title 18, United States Code, Section 201(c)(1)(A), Paying an Illegal Gratuity to a Public Official.

Court's Exhibit

1

Forfeiture

2. In exchange for the concessions made by the government, the defendant agrees not to contest the civil forfeiture action in District of Colorado case number 18-cv-03208. The defendant agrees fully to assist the government in the recovery and return to the United States of any assets, or portions thereof, that are subject to forfeiture wherever located. The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those held or controlled by a nominee.

Restitution

3. Pursuant to Title 18, United States Code, Section 3663(a)(1)(A), the government and the defendant agree to the entry of an order for restitution to the Veterans Health Administration in the full amount of the illegal gratuity payments he made, totaling $1,007,205.00.

4. The defendant acknowledges that, by law, forfeiture of the defendant's assets is not treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture. As noted below in the Government's Obligations, however, the United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from forfeiture of the defendant's assets, including the sale of judicially-forfeited assets, be remitted or restored to eligible victims of the offenses for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws. The defendant understands that the United States

Attorney's Office has authority only to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law. The government agrees that any sums so approved and remitted or restored will be credited towards the defendant's restitution obligation.

Appellate Waiver

5.   The defendant is aware that Title 18, United States Code, Section 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction (24 months); or (2) the government appeals the sentence imposed. If any of these two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

6.   The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under Title 28, United States Code, Section 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the

defendant was prejudiced by prosecutorial misconduct. If the government appeals the sentence imposed by the Court in this case, the defendant is released from this waiver provision.

*Government's Obligations*

Dismissal of Charges

7. At sentencing, the government agrees to dismiss Counts 24, 25, and 26 of the Superseding Indictment.

Acceptance of Responsibility Recommendation

8. Provided the defendant does nothing inconsistent with accepting responsibility between the date of his plea and the date of sentencing, the government will recommend that the defendant receive the maximum reduction for acceptance of responsibility.

Forfeiture

9. The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from forfeiture of the defendant's assets, including the sale of judicially-forfeited assets, be remitted or restored to eligible victims of the offenses for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws.

No Further Charges

10. The United States Attorney's Office for the District of Colorado agrees not to pursue any additional charges against the defendant based on conduct known to date to the United States Attorney's Office for the District of Colorado.

Sentencing

11.  The government makes no commitment with respect to the sentence it will recommend. The government agrees to consider any motion for variance filed by the defendant.

## II. ELEMENTS OF THE OFFENSE

12.  The parties agree that the elements of the offense to which this plea is being tendered are as follows:

*First*: the defendant gave, offered, or promised, directly or indirectly, anything of value not authorized by law to Joseph Prince;

*Second*: at that time, Joseph Prince was a public official; and

*Third*: the defendant did so for or because of an official act performed by the public official.

Tenth Cir. Crim. Jury Instr. § 2.13 (2011 ed., 2018 update).

## III. STATUTORY PENALTIES

13.  The maximum statutory penalty for a violation of Title 18, United States Code, Section 201(c)(1)(A) is: not more than two years imprisonment, a fine not more than the greater of $250,000 or twice the gross gain or twice the gross loss resulting from the offense, or both a fine and imprisonment; not more than one year supervised release; a $100 special assessment fee; and restitution.

14. If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV. COLLATERAL CONSEQUENCES

15. The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V. STIPULATION OF FACTS

16. The parties agree that there is a factual basis for the guilty plea the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in Title 18, United States Code, Section 3553, additional facts may be included below that are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

17. This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts that do not contradict facts to which the parties have stipulated and that are relevant to the Court's guideline computations, to other Section 3553 factors, or to the Court's overall sentencing decision.

18. The parties agree that the date on which relevant conduct began is not later than September 2017. The parties agree as follows:

6

19. At all times relevant to the charged conduct, in 2017 and 2018, the Department of Veterans Affairs ("VA") provided health care benefits to certain Korea and Vietnam Veterans' birth children diagnosed with spina bifida ("SB"). The VA's SB Health Care Benefits Program paid for home health services, including home health aide services and homemaking services, provided specific program requirements were met. The Veterans Health Administration Office of Community Care in Denver, Colorado, managed the SB Health Care Benefits Program, including authorization of benefits and the subsequent processing and payment of health care claims.

20. Defendant Joseph Prince was a VA employee who worked for the Office of Community Care in Denver. Prince was a Beneficiary/Provider Relationships Specialist for the SB Health Care Benefits Program, responsible for maintaining expertise in the benefits program, acting on behalf of beneficiaries and health care providers on questions and issues regarding the program, and coordinating with health care providers, among numerous other duties. Prince worked in a call center at the VA, spending most of his day speaking on the phone with health care providers and SB beneficiaries or their families regarding beneficiaries' health care needs and reimbursement for care.

21. The government's evidence is that not later than June 2017, without regard to SB Health Care Benefit Program requirements, Prince began improperly and incorrectly telling family members and others with close relationships to SB beneficiaries that they could be compensated as a "home health aide" for caring for SB beneficiaries. Prince told the caregivers and the beneficiaries that the VA would not pay them directly

for such care, but the caregivers simply had to sign up as a contractor with a VA-"vetted" home health agency to provide home health aide services. Prince informed them the caregivers could be paid approximately $16 per hour by the home health agency, which would in turn bill the VA for the services.

22. Vaughn was a long-time friend of Prince's from their church in Denver, where Prince was a deacon. Vaughn lived in Denver for many years but moved to St. Thomas, Virgin Islands, in 2016. In September 2017, Vaughn moved from St. Thomas to Florida following Hurricane Irma. Vaughn had worked for a hotel on St. Thomas and, due to the hurricane, was out of a job and looking for work. In the past, Vaughn had worked as a real estate agent, mortgage broker, and in hospitality services. He had no professional background in home health care or medical services of any kind. In September 2017, after Vaughn moved to Florida, Prince asked Vaughn if he would be interested in opening a business to work with the VA on home health. Vaughn knew that Prince was employed by the VA and had been for many years. Prince explained to Vaughn that Prince's job involved working with the VA's SB program and "assigning" beneficiaries of the program to home health agencies to receive home health aide services. Prince asked Vaughn if Vaughn would pay Prince a percentage of what Vaughn made by running this company, and Vaughn agreed.

23. Prince instructed Vaughn on how to start the business and to register with the VA to receive payments. Prince provided Vaughn a list of possible names for a home health agency, and Vaughn chose Legacy Home Health ("Legacy"). Vaughn registered the business as a limited liability company with the Florida Secretary of State

on September 25, 2017. Although Prince sent Vaughn information on licensing requirements for home health agencies on September 25, 2017, Vaughn never obtained a home health agency license for Legacy. Vaughn opened a bank account for Legacy and submitted paperwork to the VA to be paid as a "vendor".

24. In late September and early October 2017, Prince e-mailed Vaughn paperwork Prince created for Legacy. Prince sent Vaughn the following: (1) an "intake form" with Legacy's name on it for recording beneficiary and caregiver details, (2) a Home Health Aide Time Log with Legacy's name on it, for caregivers to use to record their hours, and (3) and an Independent Contractor Agreement with Legacy's name on it, to sign the caregivers up as contractors with the company, among other documents.

25. In October and November 2017, Vaughn set up a business, with Prince's assistance, to submit claims to the VA for home health services provided by SB beneficiary family members. Vaughn would contact the caregiver family members for SB beneficiaries, whom Prince had directed to use and referred to Legacy. Vaughn would sign the caregiver up as a "contractor" for Legacy Home Health by having them sign the contract. Vaughn provided the caregiver the time log, on which the caregivers were to record hours delivering "home health aide" services to the SB beneficiary. Legacy provided no training or instruction to the caregivers on how to provide home health aide services, no medical supervision, and no liability insurance. In short, all Vaughn did was submit claims to the VA for the caregiver's time and pay the caregivers the hourly rate set by Vaughn and Prince, usually $16 per hour. Caregivers submitted their weekly time logs to Vaughn, and Vaughn submitted these log sheets and

associated claims on a CMS Form 1500 to Prince for processing. Vaughn billed the VA, and the VA paid, approximately $88 per caregiver hour. Prince forwarded the claims he received from Vaughn internally to the proper VA department for claims processing. The VA then issued payment to Legacy when claims processed. After paying the caregiver and retaining a percentage for "expenses," Vaughn and Prince split the remainder.

26. On October 5, 2017, Prince e-mailed Vaughn the personal information for Legacy's first client, SB beneficiary J.D. That same day, Prince called Vaughn from his VA phone. All calls made or received on Prince's VA phone were recorded because Prince worked in the VA call center. Prince told Vaughn that he should not contact beneficiaries that Prince gave to Vaughn until Prince has spoken to them first. Prince provided the personal information for the specific SB beneficiary and his mother and directed Vaughn regarding how and when to contact the caregiver. During this conversation, at one point Prince ceased conversation for a time and explained to Vaughn thereafter that "there is only so much I can say in the presence of my coworker," who Prince said was sitting "right there."

27. Prince directed the caregivers for seven SB beneficiaries to use Vaughn's company, Legacy Home Health, for billing "home health aide" services to the VA. As noted, Legacy did not have and never obtained a home health agency license. Additionally, with one exception, the caregivers Legacy hired as "contractors" were family members of the SB beneficiaries who were not Certified Nursing Assistants and did not have any other medical licensure or registration. Legacy never hired a registered

nurse or any other licensed health care provider to supervise the caregivers. As such, the government's evidence is that the services for which Legacy submitted claims were not provided by an "approved health care provider" per the SB health care benefits program requirements, nor were the services supervised by a registered nurse, also as required by the SB health care benefits program.

28.  Over the course of approximately seven months beginning October 30, 2017, and continuing through May 21, 2018, Vaughn made approximately 72 submissions directly to Prince containing 4,337 claims for home health services for the seven SB beneficiaries. Prince reviewed the claims and, in turn, forwarded them to be processed within the VA. The VA issued payments on those claims totaling $3,039,761.36. Because the services billed were not provided by approved health care providers with nurse supervision, none of these claims were valid under the SB health care benefits program.

29.  After Vaughn received his first payment from the VA on November 3, 2017, Vaughn had a conversation with Prince on Prince's recorded VA line about what to do with the money. Consistent with their prior agreement, Prince told Vaughn to pay the caregiver $16 per hour for the hours billed, subtract a percentage for expenses, then split the remainder between the two of them. Specifically, after Prince told Vaughn how much to pay the caregiver, Vaughn then said, "and then we split whatever's left. That's the calculation I'll do. Is that correct?" Prince replied, "Yes." Also during this phone call, Vaughn cautioned Prince to be careful how he spends his money, because "you don't want them thinking that you're making it somewhere else."

30. From then on out, when the VA issued payments to Legacy, Prince would draft a document he titled, "[Beneficiary Last Name] Calc" or "[Beneficiary Last Name] Disbursements" in which Prince calculated the money to be paid out based on Prince and Vaughn's agreement. Prince sent the documents to Vaughn as instructions on how much Vaughn was to pay the caregivers and Prince. As an example, the image below shows one such document that Prince sent to Vaughn on December 5, 2017:

███ DISBURSEMENTS

Total Amt Paid- $77,056.00

Contractor Reimbursement:

12 hrs x $16.00 = $192.00/day

$192.00 x 56 days = $10,752.00.

$77,056.00 - $10,752.00 = $66,304.00.

$66,304.00 x .10% = $6,630.00.

Total Operating Costs = $6,630.00

Remaining Balance = $59,674.00

Each = **$29,837.00.**

31. Vaughn paid Prince pursuant to their agreement to split the net profits fifty-fifty. Prince directed Vaughn to make the payments to Prince's company, Crosswalk Consulting LLC ("Crosswalk"). Beginning December 5, 2017, and continuing through June 1, 2018, Vaughn made 18 payments to Prince through Crosswalk totaling $1,007,205.00.

32. On December 15, 2017, Prince called Vaughn from his recorded VA line. They discussed how much the VA had paid to Legacy to date. Prince asked Vaughn if

he had any idea how much his company had billed the VA since October 2017 (in less than two months). Prince told Vaughn $937,744. Prince clarified that only $639,912 of that amount had been paid so far. Prince stated that it was going to start to be harder to keep track of how much had been paid when they got more beneficiaries. Prince then stated, "But just so you know, C-H-A-C-H-I-N-G."

33. Legacy had no clients other than those provided by Prince. Legacy did no advertising and did not seek out clients beyond those Prince provided. Prince told Vaughn not to talk to anyone about Vaughn's business.

34. Vaughn also misrepresented Prince's relationship with Legacy and the nature of Prince's employment with the VA to third parties. On March 23, 2018, Vaughn had a telephone conversation with Prince on Prince's VA line. Vaughn told Prince that his bank had asked questions about who Prince was and why Vaughn was sending him so much money. Vaughn explained to Prince that he told the bank that Prince was a "consultant" and reassured Prince that, "I never did tell them who you work for," and "I never did say you work for the VA."

35. As charged in Count 27 of the Superseding Indictment, on June 1, 2018, Vaughn authorized the transfer of $236,736 from JPMorgan Chase account #2795 in the name of Legacy Home Health, LLC, to JPMorgan Chase account #7280 in the name of Crosswalk Consulting LLC. Vaughn made the payment to Prince for and because of Prince's referral of SB beneficiaries to Legacy Home Health and his direction to the SB beneficiaries and their caregivers to use Legacy. At all times relevant to the charged conduct, in 2017 and 2018, Prince was a public official as an

13

employee of the Department of Veteran's Affairs, acting in his official function and under the authority of the Department. Prince's act of referring, directing, or "assigning", in Prince's words, a beneficiary to Legacy was an official act, a specific decision and action on a question and matter then pending before the VA.

## VI. ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

36. The parties understand that the imposition of a sentence in this matter is governed by Title 18, United States Code, Section 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. To aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A. The applicable Chapter 2 guideline for payment of gratuities is Section 2C1.2. The base offense level is **9**. U.S.S.G. § 2C1.2(a)(2).

B. Two offense levels should be added because the defendant paid more than one gratuity. *Id.* § 2C1.2(b)(1).

C. The offense level is adjusted upward based on the value of the gratuities paid. *Id.* § 2C1.2(b)(2). Because the defendant paid gratuities totaling $1,007,205.00 (more than $550,000 but less than $1,500,000), fourteen offense levels should be added. *See id.* § 2B1.1(b)(1)(H).

14

D.  The adjusted offense level should be **25**.

E.  Pursuant to Section 3E1.1(a) and (b), and assuming continued acceptance of responsibility, the defendant should receive a three-level reduction for acceptance of responsibility. The resulting offense level is **22**.

F.  The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

G.  The career offender/criminal livelihood/armed career criminal adjustments would not apply.

H.  The advisory guideline range resulting from these calculations is **41 to 51 months**. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 41 months (bottom of Category I) to 105 months (top of Category VI). In any case, the sentence may not exceed the statutory maximum of **24 months**.

I.  Pursuant to guideline Section 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $15,000 to $150,000, plus applicable interest and penalties.

J.  Pursuant to guideline Section 5D1.2, if the Court imposes a term of supervised release, that term should be not more than one year.

37.	The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

38.	No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other Section 3553 factors.

39.	The parties understand that the Court is free, upon consideration and proper application of all of the Section 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any Section 3553 factor.

## VII.  ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement.  There are no other promises, agreements (or "side agreements"), terms, conditions, understandings,

or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions, or assurances.

Date: 8-1-19

_____
Roland Vaughn
Defendant

Date: 8/1/2019

_____
John Schlie
Attorney for Defendant

Date: 8/1/2019

_____
Anna Edgar
Assistant United States Attorney